Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| | | |
|---|---|---|
| LUNA RESIDENTIAL III LLC<br><br>Demandante-Recurrida<br><br><br>v.<br><br>SAMUEL PASTRANA MELÉNDEZ POR SI Y COMO MIEMBRO DE LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA CON JOSEFINA AMILIVIA REYES T/C/C JOSSIE AMILIVIA REYES<br><br>Demandada-Peticionaria | KLCE202400141 | *CERTIORARI* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil Núm. SJ2018CV00578<br><br>Sobre: Cobro de Dinero (ordinario), Ejecución de Hipoteca - ordinaria |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de junio de 2024.

Comparece la parte peticionaria, Samuel Pastrana Meléndez y Josefina Amilivia Reyes t/c/c Jossie Amilivia Reyes y la Sociedad Legal de Gananciales Compuesta por Ambos (en adelante, "parte peticionaria"), para solicitarnos que se revise y revoque la *Resolución* emitida el 6 de noviembre de 2023 y notificada el 7 de noviembre del mismo año por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, "TPI"), en la cual declaró No Ha Lugar la Moción Solicitando Desestimación.

La parte recurrida, Luna Acquisition III LLC (en adelante "parte recurrida"), compareció mediante *Alegato en Oposición a Certiorari Civil*.

Por los fundamentos que expondremos a continuación, se *expide* el auto de *certiorari* y se *revoca* la *Resolución* recurrida.

**I.**

El 8 de febrero de 2018, la parte recurrida presentó una demanda de cobro de dinero y ejecución de hipoteca por la vía ordinaria contra la parte peticionaria.[1] La demanda alegaba que la parte peticionaria incumplió con sus obligaciones bajo cierto "Pagaré" a favor de First Bank de Puerto Rico y la Escritura de Hipoteca núm. 144, de fecha 16 de abril de 2009, la cual grava la finca número 15246, inscrita al folio 129 del Tomo 789 de Río Piedras Sur, Registro de la Propiedad de San Juan, Sección IV, inscripción décima. Además, se alegó en la demanda que la parte peticionaria incumplió con los pagos mensuales, según acordados en el "Pagaré", que la deuda estaba líquida, vencida y exigible, y que los intentos de cobrarla habían sido infructuosos.

La parte peticionaria fue emplazada el 2 de marzo de 2018[2] y contestó la demanda el 21 de mayo de 2018.[3] Invocó, entre otras defensas afirmativas, (1) que la propiedad en garantía del préstamo era su hogar seguro y residencia principal, y que tenía derecho a beneficiarse de la Ley Núm. 184-2012, según enmendada, *infra*; (2) que la cuantía se disputaba según alegada; y (3) que faltaba parte indispensable, a saber: el tenedor y dueño del Pagaré, entre otras defensas.

El 9 de julio de 2018, la parte recurrida solicitó al Tribunal que se refiriera el caso a mediación de conflictos. De conformidad con dicha petición, el 23 de agosto de 2018 el TPI acogió la solicitud y refirió el caso a mediación. Posteriormente, el 17 de octubre de 2018, el Centro de Mediación de Conflictos (en adelante, "CMC") presentó una *Moción Solicitando Extensión de Término en Casos de*

---

[1] Apéndice del recurso, pág. 26-29; Es menester señalar que hubo una sustitución de parte, debido a que, la parte recurrida presentó una *Moción en Solicitud de Sustitución de Parte Demandante*, en la cual informó que First Bank de Puerto Rico vendió ciertos activos a Luna Residential III, LLC.
[2] Apéndice del recurso, pág. 30-34.
[3] Apéndice del recurso, pág. 35-40.

*Ejecución de Hipoteca,* donde informó que las partes fueron citadas para el 15 de octubre de 2018 y que se estableció un nuevo señalamiento para el 3 de diciembre de 2018, toda vez que estaban en el proceso de negociación y requerían de tiempo adicional para completar la entrega de documentos y evaluación de los mismos.

Así las cosas, el 6 de diciembre de 2018, el CMC presentó una *Moción Informativa en Casos de Ejecución de Hipoteca,* a la cual anejaron la *Notificación al Tribunal en Casos de Ejecución de Hipoteca,* indicando que las partes habían comparecido al proceso de mediación y no habían logrado acuerdos.[4]

La parte peticionaria acudió a las oficinas de Loss Mitigation de First Bank y presentó una solicitud completa para una modificación hipotecaria.[5] Luego de varios trámites procesales impertinentes, el 30 de marzo de 2020, la parte recurrida solicitó la paralización de los procedimientos mediante *Moción en Solicitud de Paralización de los Procedimientos,* como parte de las medidas temporeras implementadas para ayudar a los deudores hipotecarios, como consecuencia de la pandemia del coronavirus (COVID-19). Dicha solicitud fue acogida por el foro recurrido mediante *Resolución* de 2 de abril de 2020 y los procesos fueron paralizados hasta el 30 de junio de 2020.[6]

Transcurrido el antedicho plazo, la parte recurrida compareció nuevamente para solicitar que se mantuviera la paralización de los procedimientos. El 7 de junio de 2021, la parte peticionaria presentó *Moción Urgente de Paralización al Amparo del Reglamento X de RESPA según implementado por la Consumer Financial Protection Bureau (CFPB)* mediante la cual informó que para la fecha de la solicitud de paralización de los procedimientos

---

[4] Apéndice del recuso, pág. 44-45.
[5] Apéndice del recurso, pág. 46-48.
[6] Apéndice del recurso, pág. 49-50.

interpuesta por la parte recurrida había cumplido con la entrega de los documentos solicitados por el Departamento de Mitigación de Pérdidas de la institución financiera, con el objetivo de ser evaluada para una alternativa de retención del hogar por vía de una modificación del préstamo hipotecario.[7] Posteriormente, la parte recurrida presentó Moción en Cumplimiento de Orden y en Solicitud de Paralización, en la que reconoció que la parte peticionaria había completado la entrega de documentos para la correspondiente evaluación en el proceso de mitigación de pérdidas ante el banco, por lo que se unió a la petición de paralización de los procedimientos. De conformidad con ello, el 6 de julio de 2021, el TPI paralizó los procedimientos hasta el 4 de octubre de 2021.

El 11 de noviembre de 2021, la parte recurrida presentó una *Moción en Solicitud de Sustitución de Parte Demandante*, en la cual informa que First Bank de Puerto Rico vendió ciertos activos a Luna Residential III, LLC y el pagaré y la correspondiente hipoteca era uno de éstos, por lo que solicitó la sustitución de parte. El 23 de noviembre de 2021, el TPI emitió *Orden* autorizando la sustitución de la parte demandante.[8]

El 6 de diciembre de 2021, la parte peticionaria presentó una *Moción Urgente de Nuevo Referido a Mediación*. El TPI le ordenó a la parte recurrida a expresarse y ésta presentó una *Moción en Cumplimiento de Orden* donde indicó que no se oponía a un nuevo referido a mediación de conflictos. El 10 de diciembre de 2021, el TPI refirió nuevamente a las partes al acto de mediación compulsoria con el nuevo acreedor. Se señaló reunión de mediación para el 24 de enero de 2022 por videoconferencia.[9]

---

[7] Apéndice del recurso, pág. 51-54.
[8] Apéndice del recurso, pág. 55-57.
[9] Apéndice del recurso, pág. 67-69.

Así el trámite, la parte recurrida presentó *Moción en Cumplimiento con Regulación Federal,* en la cual informó que la parte peticionaria había completado una solicitud de mitigación de pérdidas ante la institución bancaria y solicitó se suspendiera la evaluación de una solicitud de sentencia sumaria previa que había presentado, mientras procedía a evaluar los documentos que entregó la parte peticionaria. El TPI acogió dicha solicitud, paralizó los procedimientos en el caso por sesenta (60) días y le concedió a la parte recurrida hasta el 8 de agosto de 2022 para presentar moción e informar el curso a seguir en el caso.[10]

Entretanto, el 21 de julio de 2022, el CMC presentó una *Moción Informativa Sobre Resultado de Ejecución de Hipoteca Atendido Mediante Videoconferencia Intramuros de los CMC* e informó al TPI que las partes participaron del proceso de la mediación y que el mismo concluyó sin acuerdos.[11]

El 4 de agosto de 2022, la parte recurrida presentó una *Moción en Solicitud de Sentencia Sumaria.*[12] El 30 de agosto de 2022, la parte peticionaria presentó una *Moción Informativa y en Solicitud de Paralización y Prórroga para Culminar Apelación a Denegatoria de Loss Mitigation.*[13] Informó que, como parte del proceso de mitigación de pérdidas ante el acreedor hipotecario, se intentó buscar alternativas de retención de la propiedad inmueble y que las mismas habían sido rechazadas. Asimismo, aludió a que había empezado el proceso de reconsideración administrativo provisto en la reglamentación federal, lo cual mantenía viva la mitigación, por lo que solicitó se paralizaran los procedimientos hasta tanto se adjudicara su solicitud de reconsideración de la denegatoria de mitigación de pérdidas. La parte recurrida presentó el 1 de

---

[10] Apéndice del recurso, pág. 70-73.
[11] Apéndice del recurso, pág. 74-75.
[12] Apéndice del recurso, pág. 76-104.
[13] Apéndice del recurso, pág. 105-111.

septiembre de 2022 una *Moción Informativa y en Cumplimiento con Regulación Federal*.[14] Allí informó que el 31 de mayo de 2022 se le había cursado una carta denegándole la solicitud de la parte peticionaria para continuar pagando el balance amortizable de su hipoteca con un pago mensual máximo de $2,500.00 por los próximos 60 meses y luego bajo un "Short Payoff" fue denegado por el inversionista. No obstante, especificó que el 15 de junio de 2022 se le remitió una nueva misiva a la parte peticionaria en la que se le notificó que su solicitud de mitigación de pérdidas fue evaluada nuevamente y que su préstamo cualificaba para una alternativa de modificación de hipoteca, condicionado a un periodo de prueba de seis (6) meses y con un depósito de $25,000.00.  A pesar de lo anterior, el 15 de agosto de 2022 se le denegó la solicitud de mitigación de pérdidas a la parte peticionaria. Así pues, peticionó –por tercera ocasión– la suspensión de los procesos mientras se evaluaba el escrito apelativo interno presentado por la parte peticionaria. Ante tales circunstancias, el TPI emitió *Orden* paralizando los asuntos relacionados con la moción de sentencia sumaria presentada por la parte recurrida y el restante de los procesos por espacio de sesenta (60) días.[15]

El 13 de marzo de 2023, se celebró vista de seguimiento por videoconferencia en la cual la parte recurrida informó que la solicitud de reconsideración presentada por la parte peticionaria fue denegada, toda vez que la deuda ascendía a más de un millón de dólares y que lo que la parte peticionaria estaba dispuesta a pagar eran $2,700.00 mensuales, los cuales no eran suficientes para cubrir el importe de la deuda pues se trataba de una hipoteca con un pago de $6,000.00. Asimismo, se informó que las circunstancias económicas de la parte peticionaria habían cambiado y que le

---

[14] Apéndice del recurso, pág. 112.120.
[15] Apéndice del recurso, pág. 121.

interesaba iniciar un nuevo proceso de mitigación de pérdidas, a lo cual la parte recurrida no tuvo reparo. Por su parte, el representante legal de la parte peticionaria reconoció que el trámite antes descrito había ocurrido de tal forma y solicitó que se le concediera un plazo de treinta (30) días para completar el paquete de evaluación de mitigación de pérdidas o, de lo contrario, se le concediera un plazo para oponerse a la solicitud de sentencia sumaria, ya que el descubrimiento de prueba había culminado. En vista de lo anterior, el foro de instancia les concedió a las partes hasta el 13 de abril de 2023 para presentar una moción conjunta para informar lo acontecido en el proceso de mitigación de pérdidas.[16]

Tras concedérsele una prórroga a la parte peticionaria para culminar la entrega de los documentos necesarios para activar el proceso de mitigación de pérdidas, el 22 de junio de 2023, la parte recurrida presenta una *Moción en Cumplimiento con Regulación Federal,*[17] en la cual informó que se recibió la nueva documentación del peticionario y que la estaban evaluando la documentación, por lo que solicitó nuevamente la suspensión de los procedimientos. El 21 de julio de 2023, el TPI emitió *Orden* en la que sostuvo que el caso estaba paralizado desde el 2020 y apercibió a la parte recurrida a informar lo ocurrido durante el proceso de mitigación de pérdidas. Luego, el 6 de octubre de 2023, la parte recurrida presentó una *Moción en Solicitud de Continuación de los Procedimientos y en Solicitud de Vista,*[18] en la cual informó que el peticionario no cualificó para ninguna alternativa de pago y solicitó un señalamiento de vista para que se le permitiera a la parte peticionaria examinar el pagaré hipotecario en controversia, puesto que se había informado falta de parte indispensable.

---

[16] Apéndice del recurso, pág. 122-124.
[17] Apéndice del recurso, pág. 125-127.
[18] Apéndice del recurso, pág. 128-129.

El 10 de octubre de 2023, la parte peticionaria presenta una *Moción de Desestimación por Incumplimiento del Acreedor con el Requisito de la Buena Fe en la Mediación Compulsoria.*[19] Alegó que la parte recurrida obró de mala fe en el proceso de la negociación, lo cual es un fundamento para desestimar la causa de acción en función de la pérdida de jurisdicción del TPI para dictar sentencia y solicitar la venta judicial de la propiedad residencial. **Como fundamento para su contención alude a los eventos ocurridos durante el proceso de mitigación de pérdidas y que se iniciaron a partir del año 2022**.

El 13 de octubre de 2023, la parte recurrida presenta una *Oposición a Moción en Solicitud de Desestimación.*[20] Allí, la parte recurrida expresó que se habían celebrado cuatro (4) reuniones en el CMC los días 23 de febrero de 2022, 27 de mayo de 2022, 28 de junio de 2022 y 21 de julio de 2022. Así también, enfatizó en que el 15 de junio de 2022 se le cursó una carta en la que se le ofrecía una alternativa de pago para la modificación de la hipoteca que le proveía un periodo de prueba por seis (6) meses, efectivo el 1 de julio de 2022 hasta el 1 de diciembre de 2022 por la cantidad de $4,038.35. sostuvo, además, que el 23 de febrero de 2022 se le orientó a la parte peticionaria sobre todas las alternativas disponibles en el mercado para la retención del inmueble, conforme al tipo de préstamo obtenido de la institución bancaria y que a pesar de que se le ofreció una alternativa de pago para la cual cualificaba la parte peticionaria decidió rechazarla. Enfatizó en que el 21 de julio de 2022 el CMC compareció para informar que el proceso de mediación había culminado sin acuerdo entre las partes y que, a base de las circunstancias anteriores, se cumplió con las exigencias de la Ley Núm. 184-2012, según enmendada, *infra*.

---

[19] Apéndice del recurso, pág. 8-25.
[20] Apéndice del recurso, pág. 130-140.

Atendidas ambas mociones, el TPI dictó *Resolución* declarando "No Ha Lugar" la solicitud de desestimación.[21] El 21 de noviembre de 2023, el peticionario presentó una *Moción de Reconsideración* [22] y el 6 de diciembre de 2023 la parte recurrida presentó una *Oposición a Moción de Reconsideración.*[23] Atendidas las posiciones de ambas partes, el 3 de enero de 2024 y notificada ese mismo día, el TPI dictó una *Orden* declarando "No Ha Lugar" la reconsideración.[24]

Inconforme con el dictamen del TPI, el 2 de febrero de 2024 la parte peticionaria presentó el auto de *Certiorari* ante nos, donde le imputó al foro recurrido el siguiente señalamiento de error:

> ERRÓ EL TPI AL DECLARAR NO HA LUGAR LA SOLICITUD DESESTIMATORIA PRESENTADA POR LA PARTE PETICIONARIA Y AUTORIZAR SIN JURISDICCIÓN LA CONTINUACIÓN DE LOS PROCEDIMIENTOS DE EJECUCIÓN DE HIPOTECA POR MOTIVO DEL INCUMPLIMIENTO DE LA PARTE RECURRIDA CON EL REQUISITO JURISDICCIONAL DE LA BUENA FE EN LOS PROCESOS DE MEDIACIÓN COMPULSORIA.

Examinado el recurso en su totalidad y con la comparecencia de ambas partes, procedemos a establecer el derecho aplicable y resolver.

**II.**

**A.**

El recurso de *certiorari* es un mecanismo procesal de carácter discrecional que le permite a un tribunal de mayor jerarquía revisar las determinaciones del tribunal recurrido.[25] La Regla 52.1 de Procedimiento Civil[26] establece los preceptos que regulan la expedición discrecional que ejerce el Tribunal de Apelaciones sobre el referido recurso para la revisión de resoluciones y órdenes

---

[21] Apéndice del recurso, pág. 6-7.
[22] Apéndice del recurso, pág. 2-5.
[23] Apéndice del recurso, pág. 141-147.
[24] Apéndice del recurso, pág. 1.
[25] *McNeil Healthcare v. Mun. Las Piedras I,* 206 DPR 391, 403 (2021).
[26] 32 LPRA Ap. V, R. 52.1.

interlocutorias dictadas por el Tribunal de Primera Instancia.[27] En lo pertinente, la Regla 52.1, *supra*, dispone lo siguiente:

> El recurso de certiorari para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de certiorari en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión.

> Cualquier otra resolución u orden interlocutoria expedida por el Tribunal de Primera Instancia podrá ser revisada en el recurso de apelación que se interponga contra la sentencia sujeto a lo dispuesto en la Regla 50 sobre los errores no perjudiciales.

32 LPRA Ap. V, R. 52.1

Por otra parte, la Regla 52.2(b)[28] establece los términos y efectos de la presentación de un recurso de *certiorari*:

> (b) *Recurso de "certiorari"*. Los recursos de *certiorari* al Tribunal de Apelaciones para revisar las resoluciones finales en procedimientos de jurisdicción voluntaria [...] deberán ser presentados dentro del término jurisdiccional de treinta (30) días contados desde el archivo en autos de copia de la notificación de la sentencia o resolución recurrida.

> Los recursos de *certiorari* al Tribunal de Apelaciones para revisar resoluciones u órdenes del Tribunal de Primera Instancia [...] deberán presentarse dentro del término de treinta (30) días contados desde la fecha de notificación de la resolución u orden recurrida. El término aquí dispuesto es de cumplimiento estricto, prorrogable sólo cuando medien circunstancias especiales debidamente sustentadas en la solicitud de *certiorari*.

> En aquellos casos que mediante recurso de *certiorari* se paralicen los procesos ante el Tribunal de Primera Instancia, el Tribunal de Apelaciones deberá resolver la controversia presentada ante sí dentro de los

---

[27] *Mun. de Caguas v. JRO Construction*, 201 DPR 703, 709 (2019).
[28] 32 LPRA Ap. V, 52.2(b)

sesenta (60) días siguientes a que las partes concernidas se hayan expresado.

32 LPRA Ap. V, 52.2(b)

La discreción del tribunal revisor no debe abstraerse del resto del Derecho, y por lo tanto, es una forma de razonabilidad aplicada al discernimiento judicial para así llegar a una conclusión justiciera.[29] Así pues, la discreción judicial para expedir o no el auto de *certiorari* no ocurre en un vacío ni en ausencia de parámetros.[30] Cónsono con lo anterior, la Regla 40 del Reglamento del Tribunal de Apelaciones[31] orienta la función del tribunal intermedio para ejercer sabiamente su facultad discrecional y establece los criterios que debe considerar al determinar si procede o no expedir un auto de *certiorari*.[32] La referida regla dispone lo siguiente:

El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

---

[29] *Mun. Caguas v. JRO Construction, supra,* 712.
[30] *IG Builders et al. v. BBVAPR,* 185 DPR 307, 338 (2012).
[31] 4 LPRA Ap. XXII-B, R. 40.
[32] *IG Builders et al. v. BBVAPR, supra,* págs. 338-339.

Cabe precisar que el recurso de *certiorari* es un recurso extraordinario discrecional que debe ser utilizado con cautela y solamente por razones de peso.[33] Es por ello que los tribunales revisores deben limitarse a aquellos casos en que la ley no provee un remedio adecuado para corregir el error señalado.[34] Nuestro ordenamiento jurídico ha establecido que el tribunal revisor sólo intervendrá con las facultades discrecionales de los foros primarios en circunstancias extremas y en donde se demuestre que éstos: (1) actuaron con prejuicio o parcialidad; (2) incurrieron en un craso abuso de discreción, o (3) se equivocaron en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo.[35]

**B.**

La Ley Núm. 184-2012, según enmendada, conocida como la "Ley para Mediación Compulsoria y Preservación de tu Hogar en los Procesos de Ejecuciones de Hipoteca de una Vivienda Principal",[36] tiene el propósito de proteger la residencia principal de los deudores hipotecarios ante los efectos de la crisis económica.[37] De conformidad con el referido propósito legislativo, el Art. 2(b) de la Ley 184, establece la definición del concepto "mediación compulsoria" en los siguientes términos:[38]

> (b) Mediación Compulsoria: En los casos en que un acreedor hipotecario pueda iniciar un proceso de ejecución de hipoteca, o el cual pueda culminar en la venta judicial, de una propiedad residencial que constituya una vivienda principal, se celebrará una reunión compulsoria de mediación conducida en una sala o salón del Tribunal o en aquel lugar que las partes

---

[33] *Pueblo v. Díaz De León*, 176 DPR 913, 918 (2009).
[34] *Id.*
[35] *Rivera y otros v. Banco Popular*, 152 DPR 140, 155 (2000).
[36] 32 LPRA sec. 2881.
[37] Exposición de Motivos de la Ley 184-2012, *supra*; En particular, la Exposición de Motivos expresa lo siguiente:
[...] es imprescindible que la Asamblea Legislativa de Puerto Rico cree una Ley con el propósito de crear un proceso de mediación compulsoria ante los tribunales de Puerto Rico o ante los foros administrativos correspondientes, previo a llevar un proceso de ejecución de hipoteca (foreclousure) de cualquier propiedad principal de vivienda en Puerto Rico por cualquier entidad bancaria. Entiéndase propiedad principal de vivienda como aquella que se usa como hogar principal, no (second home), y que para fines de contribuciones sobre bienes inmuebles es la primera residencia o aquella que gozaría de aplicar en cada caso de una exención contributiva. (Énfasis suplido).
[38] 32 LPRA sec. 2881n.

en acuerdo con el mediador seleccionen, pero que no podrá ser en las oficinas del acreedor hipotecario o de sus abogados o representantes legales o asesores, y presidida por un mediador seleccionado por las partes, en el curso de un procedimiento de ejecución de hipoteca sumario y/o ordinario. **En dicha reunión el acreedor hipotecario notificará al deudor hipotecario todas las alternativas disponibles en el mercado para poder evitar la ejecución de la hipoteca o la venta judicial de una propiedad residencial que constituya una vivienda principal. El propósito u objetivo será poder llegar a un acuerdo o modificación que permita al deudor hipotecario establecer un acuerdo de pago u otra alternativa satisfactoria a las partes y no perder su vivienda principal**. (Énfasis suplido).

Por su parte, los incisos (d) y (e) definen la figura de deudor hipotecario y la definición de residencia o vivienda principal, en estos fines:

(d) Deudor Hipotecario: Persona natural que ha incurrido en un préstamo de consumo o para propósitos personales o de familia garantizado con un gravamen hipotecario sobre su residencia o vivienda principal. Esta definición incluirá a todas las personas naturales que sean responsables o que pudieran advenir responsables por la obligación que se intenta hacer efectiva en el procedimiento de cobro o de ejecución de hipoteca.

(e) Residencia o Vivienda Principal: aquella que se utiliza como el hogar principal del deudor o del deudor y su familia inmediata; y que para fines contributivos sobre bienes inmuebles es aquella para la cual aplicaría la exención contributiva principal.

Asimismo, el Art. 3 de la aludida ley[39] establece que el tribunal deberá ordenar la celebración de una vista de mediación compulsoria, como requisito jurisdiccional. En lo pertinente, el mencionado artículo dispone lo siguiente:

Será deber del Tribunal, al presentarse la demanda y diligenciarse el emplazamiento, citar a las partes a una vista o acto de mediación compulsoria que presidirá un mediador seleccionado por las partes y que tendrá lugar en cualquier salón o sala del tribunal o en aquel lugar que las partes en acuerdo con el mediador seleccionen, en la cual se le informará de formas verbal y por escrito al deudor hipotecario todas las alternativas disponibles en el mercado de acuerdo al tipo de préstamo e inversionista para poder evitar la privación del inmueble al deudor, ejecución de la hipoteca o la venta judicial de una propiedad residencial que

---

[39] 32 LPRA sec. 2882.

constituya una vivienda principal, incluyendo aquellas alternativas que no dependen de la capacidad económica del deudor, como lo son la venta corta ("short sale"), la dación en pago, entrega voluntaria de título, y otros remedios que eviten que el deudor pierda su hogar o que, de perderlo, se minimicen las consecuencias negativas sobre el deudor.

[…]

De no presentarse el acreedor hipotecario, al procedimiento de mediación, en cualquiera de sus etapas, sin que medie justificación adecuada, o **determinar el Tribunal que no se actuó de buena fe en cuanto al ofrecimiento de alternativas disponibles o la evaluación realizada al deudor y luego de haber dilucidado la controversia en vista evidenciaria, el Tribunal procederá a desestimar sin perjuicio la demanda presentada**. (Énfasis suplido).

Al considerar el mencionado Art. 3, nuestro Tribunal Supremo ha expresado que "nuestra interpretación es cónsona con el espíritu de la ley y la intención legislativa de otorgar a los deudores la oportunidad de conocer los remedios que pueden tener disponibles para evitar la pérdida de su hogar."[40] Con la vista de mediación, el deudor podrá obtener información sobre los remedios que tiene disponible para evitar la pérdida de su residencia principal y, a su vez, tendrá la oportunidad de sentarse a negociar con su acreedor.[41] El requisito jurisdiccional que impone la Ley 184-2012, se refiere a que ocurra un señalamiento o citación para una vista de mediación, pero la extensión de dicho procedimiento y su resultado dependerán de la conducta de las partes.[42]

El Tribunal Supremo resolvió que el propósito de la Ley 184-2012 es que el acreedor y el deudor lleguen a un acuerdo que evite la ejecución y la venta en pública subasta de la vivienda principal del deudor.[43] En otras palabras, el fin principal de la mediación es evitar un pleito.[44]

---

[40] *Bco. Santander v. Correa García*, 196 DPR 452, 472 (2016).
[41] *Bco. Santander v. Correa García, supra,* pág. 461.
[42] *Id.*, pág. 473.
[43] *Id.*
[44] *Scotiabank v. SLG Rosario-Castro*, 205 DPR 537, 552 (2020).

No obstante, el 27 de mayo de 2019 se aprobó la Ley Núm. 38- 2019 (Ley 38). En particular, su Exposición de Motivos hace referencia a que el proceso de mediación entre una persona particular y una institución financiera propugna "ayuda[r] a las personas en el conflicto a lograr un acuerdo aceptable para ambos".[45] Además, dispone que en la reunión de mediación entre las partes corresponderá al acreedor hipotecario notificar al deudor hipotecario "todas las alternativas disponibles en el mercado para poder evitar la ejecución de la hipoteca o la venta judicial de su vivienda principal".[46] Luego de detallar algunas de esas alternativas, el Legislador especificó que el propósito de esta reunión de mediación es "evaluar la posibilidad de llegar a un acuerdo satisfactorio para ambas partes."[47] De incumplirse con lo requerido por dicho estatuto, conllevaría la desestimación de la causa de acción.

Por su parte, la Ley 184-2012 no incluyó originalmente una disposición expresa que facultara al tribunal a imponer sanciones específicas cuando el acreedor no obra de buena fe en el proceso de mediación compulsoria.[48] Aunque la Asamblea Legislativa corrigió posteriormente esa laguna al imponer como única sanción la desestimación de la demanda, lo cierto es que las enmiendas de la Ley 38 no son de carácter retroactivo.[49] Lo anterior significa que la desestimación como sanción no está disponible para aquellos procesos que se instaron al amparo de la Ley 184-2012 antes de que entraran en vigor las enmiendas de la Ley 38 en el 2019.[50] Sin embargo, nuestro Tribunal Supremo dispuso que:

> "tratándose la mediación compulsoria de un procedimiento que se celebra mientras el tribunal retiene su jurisdicción, nada impide que en esos casos

---

[45] Exposición de Motivos de la Ley Núm. 38-2019.
[46] *Id.*
[47] *Id.*
[48] *Scotiabank de Puerto Rico v. Rosario Ramos, supra,* pág. 555.
[49] *Id.*
[50] *Id.*

el juez del foro primario, en su sana discreción, imponga otras sanciones a tenor de la Regla 44.2 de Procedimiento Civil, 32 LPRA Ap. V, por conducta constitutiva de demora u obstrucción en perjuicio de la eficiente administración de la justicia."[51]

Por otro lado, en *Scotiabank de Puerto Rico v. Rosario Ramos*,[52] el Tribunal Supremo aclaró lo que conlleva el cumplimiento del requisito de la mediación al amparo de la Ley Núm. 184-2012. Dicho foro se enfrentó a la controversia de determinar si se incumplía con el requisito jurisdiccional cuando se celebraba la vista o acto de mediación compulsorio bajo el aludido estatuto, y la conducta de una de las partes no es acorde con la buena fe. A su vez, se debía determinar cuál era el proceder cuando el acreedor actúa de mala fe cuando se celebra la vista o acto de mediación, pero no se proveen todas las alternativas disponibles en el mercado. Ante tales controversias, nuestra máxima curia aclaró que, al amparo de la Ley 184-2012, es un requisito que la conducta de las partes en el proceso de mediación sea acorde con la buena fe. También determinó que cuando un acreedor hipotecario no provee todas las alternativas disponibles en el mercado claramente no actúa conforme a la buena fe.[53]

### III.

En su recurso, la parte peticionaria sostiene que la parte recurrida no cumplió con el requisito de actuar conforme a la buena fe durante el proceso de mediación compulsoria, esto debido a que presuntamente no les presentó todas las alterativas disponibles en el mercado para evitar la ejecución de su vivienda principal. Por su parte, la parte recurrida aduce que el recurso de *Certiorari* presentado por la parte peticionaria debe de ser denegado. En síntesis, fundamenta su solicitud en que el foro primario no abusó

---

[51] *Id.*
[52] *Scotiabank de Puerto Rico v. Rosario Ramos, supra.*
[53] *Id.*

de su discreción al declarar "No Ha Lugar" la solicitud desestimatoria presentada por la parte peticionaria, puesto que en el presente caso se cumplió con el requisito de buena fe que impone la Ley Núm. 184, *supra.*

Conforme hemos adelantado, el requisito de la buena fe en el proceso de la mediación compulsoria requiere que el acreedor hipotecario notifique al deudor todas las alternativas disponibles en el mercado para poder evitar la ejecución de la hipoteca de una propiedad residencial que constituya una vivienda principal. Así, conforme el Art. 3 del estatuto, la determinación sobre si medió buena fe por parte del acreedor hipotecario durante el acto de mediación se debe dilucidar en una vista evidenciaria. De conformidad con la aludida disposición estatutaria, la determinación sobre si en el ofrecimiento de alternativas disponibles en el mercado por parte del acreedor y la evaluación realizada al deudor cumplió con el requisito de buena fe es un requisito indispensable en la continuación de todo proceso de ejecución de toda hipoteca que recae sobre la residencia principal de todo deudor. Lo cual, según lo requirió taxativamente, hace indispensable la celebración de una vista en la que el foro de instancia deba aquilatar la prueba que se le presente sobre el asunto y adjudicar si medió o no buena fe en dicho proceso.

Un examen detenido de las incidencias procesales del caso de autos revela que se han celebrado dos (2) actos de mediación, al amparo de la Ley Núm. 184, *supra,* y que las partes han efectuado múltiples esfuerzos dirigidos a la retención de la propiedad en controversia en el proceso de mitigación de pérdidas ante el acreedor hipotecario. Sin embargo, luego de todos estos esfuerzos desplegados, mediante la presentación de la moción de desestimación de la parte peticionaria se suscitó una controversia sobre si medió o no buena fe en el ofrecimiento de alternativas

disponibles en el mercado para la retención de la propiedad y la correspondiente evaluación de la parte peticionaria para la mismas. Lo anterior, y de conformidad con el Art. 3 de la Ley Núm. 184, *supra*, requería que el foro *a quo* adjudicara dicha controversia, luego de la celebración de una vista evidenciaria. No obstante, ello no ocurrió.

Así pues, al haberse incumplido con el requisito estatutario que provee la Ley Núm. 184, *supra*, para la dilucidación de toda controversia sobre la existencia de buena fe durante el acto de mediación compulsoria en una vista evidenciaria, concluimos que el foro de instancia erró al incumplir con lo dispuesto en el Art. 3 del estatuto y procede la devolución del caso para que las partes presenten la evidencia pertinente al asunto, que el TPI aquilate la misma y determine si medió o no buena fe durante la vista de mediación compulsoria celebrada en este caso con la parte recurrida.

**IV.**

Por los fundamentos antes expresados, los cuales hacemos formar parte integral de la presente *Sentencia*, *expedimos* el auto de *certiorari*, *revocamos* la *Resolución* recurrida y devolvemos el caso al Tribunal de Primera Instancia, Sala Superior de San Juan para que se celebre la vista evidenciaria, de conformidad con el Art. 3 de la Ley Núm. 184-12.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones